RENNO v. SEABOARD AIR LINE RY., *ET AL.*

(112 S. E. 439)

1. APPEAL AND ERROR—THERE IS PRESUMPTION THAT EVIDENCE IS SUFFICIENT TO SUPPORT VERDICT AND JUDGMENT.—Since the jury are regarded as better qualified to pass upon the facts than even the presiding Judge, and the presiding Judge because he heard the witnesses testify, had a better opportunity than the Supreme Court to judge of their credibility, there is a presumption, where the Circuit Judge found there was evidence sufficient to support the verdict, that such finding was free from error, so that the plaintiff, who recovered a verdict below, occupies a more favorable position in the Supreme Court than he had in the Circuit Court, where the burden rested upon him.

2. NEGLIGENCE—CREATOR OF ATTRACTIVE NUISANCE MUST PROTECT CHILDREN.—One who artificially brings or creates on his own premises any dangerous thing which from its nature has a tendency to attract children to play with it is bound to take such reasonable precaution as the circumstances admit to protect children from injury while so playing with or coming in its vicinity.

3. NEGLIGENCE—EVIDENCE ON ISSUE OF ATTRACTIVE NUISANCE HELD TO WARRANT REFUSAL OF DIRECTED VERDICT.—Evidence that a railroad permitted a pond created on its premises by the violent rush

of water through a culvert too small for the purpose to remain
undrained and unguarded after it had knowledge that boys were
going swimming there, and that it was dangerous because of its
depth, *held* to bring the case within the attractive nuisance doc-
trine, so that it was not error to refuse to instruct a verdict for
defendant.

4. RAILROADS—DIRECTOR GENERAL LIABLE FOR PERMITTING ATTRAC-
TIVE NUISANCE.—The Director General of Railroads is liable un-
der Federal Control Act March 21, 1918, § 10 (U. S. Comp. St.,
1918, U. S. Comp. St. Ann. Supp. 1919, § 3115¾j), for the death
of a boy resulting from an attractive nuisance which the Director
General permitted to remain upon the railroad right of way.

Before MOORE, J. Laurens, Fall Term, 1920. Affirmed.

Action by W. H. Renno as Administrator of the Estate
of Henry Renno, deceased, against Seaboard Air Line Rail-
way and Walker D. Hines, Director General. Judgment for
plaintiff against the Director General and he appeals.

Defendant's exceptions were as follows:

The defendant, Walker D. Hines, Director General of
Railroads, appeals to the Supreme Court of South Caro-
lina from the order of his Honor, Earnest Moore, pre-
siding Judge, in overruling his motion for a directed ver-
dict in his favor made at the conclusion of all the testimony
on the trial of this cause, and from his order refusing de-
fendant's motion for new trial, and from the judgment
entered on the verdict herein upon the following grounds
of appeal and exceptions to wit:

(1) Because his Honor erred in overruling the de-
fendant's motion for a directed verdict in his favor at the
conclusion of all the testimony, on the ground that no
actionable negligence of the defendant had been alleged
or established, and he should have so held.

(2) Because his Honor erred in not holding on de-
fendant's motion for a directed verdict at the conclusion
of all the testimony that the testimony failed entirely to
show that the defendant owed plaintiff's intestate any duty

whatsoever under the facts and circumstances of the case, and his Honor should have so held.

(3) Because his Honor erred in not holding on defendant's motion to direct a verdict in his favor at the conclusion of the testimony that the entire testimony failed to show that the defendant had notice or knowledge that its right of way was made use of and resorted to by children of tender years as a place of amusement, whereas he should have so held.

(4) Because his Honor erred in not holding on a directed verdict in his favor that plaintiff had failed to establish by the testimony that the defendant had created, erected, constructed, or maintained "an attractive nuisance," whereas, he should have held that the doctrine or law of attractive nuisances was not applicable to the facts of this case.

(5) Because his Honor erred in not holding on defendant's motion for a directed verdict in his favor at the conclusion of the testimony that the "wash hole" or pool of water in the branch in which plaintiff's intestate was drowned was not located on or near or in close proximity to a street, public highway, park, or other public place, and that it was not in an incorporated town or village, or in close proximity to or near by a thickly populated community, whereas he should have so held.

(6) Because his Honor erred in refusing the defendant's motion for a directed verdict in his favor at the conclusion of all the testimony, on the ground that the wash hole or pool of water was located in the country, in a sparsely settled community, at a considerable distance from the corporate limits of the city of Clinton, and from the community of the Lydia Mill village, and partly within the limits of a private pasture of an adjoining landowner, in a natural water course, at some considerable distance from any public highway, street, or public place, and not imme-

diately adjacent to or near by any place where children of tender years resorted for the purpose of play or amusement, whereas he should have so held.

(7) Because his Honor erred in refusing defendant's motion for a directed verdict in his favor at the conclusion of all the testimony on the ground that there was no duty of the defendant to protect or safeguard its right of way at the place in question against trespassers, either adults or children, and especially as against trespassing children of sufficient age and discretion and intelligence to know and appreciate, and who did know and appreciate the danger, and that such children who know and appreciate the danger stand in identically the same position as adult trespassers, and take the premises as they find them, with all the perils and dangers, and cannot recover for any injury accruing while trespassing, or while there as licensees, whereas he should have so held.

(8) Because his Honor erred in refusing defendant's motion to direct a verdict in his favor at the conclusion of the testimony, on the ground that plaintiff's intestate was a bright, active and intelligent boy of sufficient age and discretion to know of and appreciate the danger, and did know and appreciate the danger, of going in swimming in the wash hole or pool of water at the time and place in question, having been warned and cautioned against so doing, and in not being able to swim and that under such circumstances, plaintiff's intestate entered upon the defendant's right of way at his own risk, and cannot recover.

(9) Because his Honor erred in overruling defendant's motion for a directed verdict in his favor at the conclusion of all the testimony, on the ground that the undisputed testimony conclusively establishes that plaintiff's intestate was a bright, active and intelligent boy who had been warned of and well knew the danger of going in swimming at the time and place in question, and therefore the only

reasonable inference of all the testimony was and is that plaintiff's intestate was the author of his own injury, and his death was therefore directly due to his own negligence.

(10) Because his Honor erred in overruling defendant's motion for a directed verdict in his favor at the conclusion of all the testimony, on the ground that the testimony shows conclusively that the cause of action is not based on any liability of the Director General of Railroads as a common carrier, and is therefore without warrant of law, the Court not having jurisdiction of the action, and his Honor should have so held.

(11) Because his Honor erred in charging the jury as follows: "Where the owner or party in possession of premises by the erection of a dam or embankment over the stream artificially converts the stream into a pool or pond, the doing of such acts, or the maintenance of such artificial pool or pond, where it was done in a populous community, and under circumstances rendering such artificial pool or pond attractive and enticing, as a dangerous place of amusement to which children of tender years in such community resorted, to the knowledge of the owner so maintaining it, such pool would constitute an attractive nuisance if the jury should so conclude from the evidence that it is maintained there, did in fact render such pool or pond dangerous as being in fact an attractive and enticing place of resort for amusement by such children, and that is was so known by the owner so maintaining it, or by the exercise of ordinary care should have been known to be such an attractive and enticing place of resort for such children. * * * But the law further declares that, where such premises are situated in close proximity to a populous community, and where the owner of such premises by the erection or maintenance of a dam or embankment, or other artificial means, makes, or maintains upon such premises an artificial construction or excavation of

such character as by its existence or condition to constitute an enticement or allurement to children in general of tender years of normal characteristics in such neighborhood where the existence or maintenance of such enticement is known by such owner to be an attraction to such children generally to congregate for play or amusement upon such premises, then the existence of such allurement is tantamount to an implied invitation to such children of tender years to come upon such premises and amuse themselves there."—the error being (a) that the jury was thereby prevented from determining that the pool or pond of water in the stream was a natural pool or pond of water, and (b) that the jury were thereby instructed in effect that the defendant would be liable to the plaintiff for the death of son if the defendant had negligently erected or maintained an embankment or fill across a natural water course, and (c) that the erection and maintenance of a culvert of insufficient size in said fill or embankment was the direct and proximate cause of the death of plaintiff's intestate, and (d) that the defendant should safeguard a pool of water in a natural watercourse if the jury should conclude that the same was dangerous to children of tender years, and (e) that his Honor thereby charged on the facts in violation of Section 26, Art. 5, of the Constitution of 1895.

(12) Because his Honor erred in charging plaintiff's request to charge as follows: "If you find from the evidence that the defendant through its agents created and maintained a fill on its right of way at the point in question, through which a natural stream of water ran, and if you further find from the evidence that the pipe or viaduct through said fill was constructed and maintained in such a manner as by its own elevation to cause and effect a hole or pool or pond to be created on its right of way in said stream immediately below said fill, if same was the proximate cause of such creation of the pool or hole, then the

pond or pool so created is an artificial pool of water, if it was so created and caused by defendant, or so maintained by the defendant by artificial means of such embankment and pipe. In other words, if the hole or pool in question was caused by artificial means put in motion by defendant, or kept in motion by defendant, then the pool in that event would constitute an artificial pool; otherwise, in the absence of proof by the greater weight of the evidence that it was caused or maintained by artificial means, a pond or pool of water in a natural running stream could not be held to be an artificial pool of water"—the error being (a) that his Honor charged the jury that the facts which the plaintiff had alleged in his complaint, if proven, proved negligence, thereby plainly charging the jury in respect to matters of fact in violation of the provisions of Section 26, Art. 5, of the Constitution of 1895, and (b) that the alleged negligent erection and construction of the fill or embankment and the alleged culvert therein of insufficient size, was the direct and proximate cause of the death of plaintiff's intestate, and (c) that the jury was thereby prevented from considering the defendant's plea of contributory negligence of plaintiff's intestate, and (d) that his Honor thereby withdrew from the consideration of the jury the question of whether or not the pool or pond in the stream was a natural pool or pond; and (e) thereby in substance the Circuit Judge charged the jury that the defendant owed the plaintiff's intestate the duty of safeguarding or protecting a natural watercourse and pool of water, which occasionally formed therein, partly on its right of way and partly on private premises.

(13) Because his Honor erred in submitting the case to the jury under the law of attractive nuisance as defined by the Supreme Court of this State, the error being that under the undisputed facts and circumstances there existed

no cause of action against the defendant under the doctrine of attractive nuisance.

(14)   Because his Honor erred in refusing defendant's motion for a new trial upon the minutes of the Court, the error being that the case does not come under the doctrine of attractive nuisance, and that the verdict of the jury was against the clear preponderance of the testimony, and contrary to the law.

(15) Because his Honor erred in refusing the defendant's motion, at the conclusion of all the testimony, for a directed verdict in his favor, and in charging the jury and in refusing defendant's motion for new trial on the minutes of the Court, the error being that the testimony fails to show (a) any actional negligence on the part of the defendant, (b) that there was a place of amusement for children of tender years at the place in question to the knowledge of the defendant, and (c) that the defendant maintained an attractive nuisance, and (d) that the location was in a thickly populated community, and (e) that the plaintiff's intestate was a bright, intelligent boy, but well knew of the danger of the washout, and was warned against going in the same, and (f) that no such action can lie against the Director General of Railroads, the cause of action not being predicated upon the Director General's common carrier liability, and (g) in that the presiding Judge in substance and effect held that the construction and maintenance of the embankment or fill containing the pipe through which the stream ran was an artificial erection, construction or instrumentality within the scope of the attractive nuisance doctrine, and that the defendant owed plaintiff's intestate the duty of protecting and safeguarding the same, which it had failed to do, and that therefore the defendant's failure in this respect was the direct and proximate cause of the death of plaintiff's intestate; and (h) that his Honor, as appears from his charge and his rulings, practically made the test

of liability in the case depend upon the alleged negligence of the defendant in the construction and maintenance of the fill and pipe across the stream in question.

*Messrs. Glenn & Glenn* and *Dial & Todd,* for appellant, cite: *Attractive nuisance*: 20 R. C. L., 80; 25 S. C., 24; 78 S. C., 10; 95 S. C., 230; 95 S. C., 302; 96 S. C., 466; 108 S. C., 522; 109 S. C., 240; 21 L. Ed., 745; 5 L. R. A. (N. S.), 266. *Courts show tendency to limit extension of doctrines:* 20 R. L., 81; 18 L. R. A. (N. S.), 179; 52 L. R. A. (N. S.), 1173; 12 N. C. C. A., 966; 35 L. R. A. (N. S.) 440. *Body of water*: 56 Am. St. Rep., 106. *Not extended to landowner allowing a pool on his lands*: 69 N. W., 899; 19 L. R. A. (N. S.), 1098; 38 L. R. A., 573; 55 L. R. A., 310; 45 L. R. A., 591; 132 Pac., 185; 51 L. R. A. (N. S.), 1032; 5 L. R. A. (N. S.), 263; 20 R. C. L., 79-98. *Charge on facts*: 76 S. C., 63; 71 S. C., 156; 83 S. C., 56. *Suit is against Government and Court has no jurisdiction*: 26 R. C. L., Sec. 63, p. 1458; 188 U. S., 400; Comp St. 1916, Sec. 1924A. *Liability of railroads under Federal control is restricted*: 267 Fed., 105; 267 Fed., 171; 270 Fed., 279.

*Messrs. H. S. Blackwell* and *Richey & Richey,* for respondent, cite: *Case is within doctrine of* 78 S. C., 10; 95 S. C., 230; 96 S. C., 466; Sec. 10 *Transportation Act is conclusive as to liability of Director General.*

April 11, 1922.

The opinion of the Court *en banc* was delivered by MR. CHIEF JUSTICE GARY.

The allegations of the complaint material to the questions involved, are as follows:

"(4) That a long time prior to the 28th day of July, 1919, the defendant, Seaboard Air Line Railway, constructed, or caused to be constructed, on its main line of railway, at or near the village of Lydia Cotton Mills, and over a running

and natural stream of water and with culvert or viaduct to carry the water through said fill, and the said fill with culvert or viaduct was so carelessly and negligently constructed that the said culvert or viaduct was not of a sufficient size to carry the water through said fill,.and, when the said stream was swollen by rains, it caused the water from said stream to rush through said culvert or viaduct with such terrific force that the said water cut or caused to be washed out on the lower side of said railroad track, and on the defendant Seaboard Air Line Railway's right of way, a hole which formed a pool of water, which hole and pool of water has grown in size from year to year, until on or about the 28th day of July, 1919, it was some 25 feet long, 12 feet wide, and ranged in depth from a few inches to 8 or 10 feet in places.

"(5)   That said hole and pool of water is located in or near the thickly populated settlement of the Lydia Cotton Mills village, and is not protected by a fence or guard of any kind or otherwise, and is easily accessible to children, who, not knowing the danger, made use of it as a place of amusement.

"(6)   That it is and was the duty of said defendants to cause the said hole and pool of water to be filled in, and to cause the culvert or viaduct through said fill to be made larger and of sufficient size to prevent a recurrence of a like washout, or, failing in this, to cause the said hole and pool of water to be securely protected, so that children resorting to it as a place of amusement would not be injured.

"(7)   That the said hole of water is of no use or benefit to the said defendants, and is a nuisance, and this plaintiff is informed, and believes, that said hole and pool of water has been condemned by the officials of the County of Laurens, S. C., and that said defendants have been notified of such condemnation; that said defendants knew or should have known the dangerous and unprotected

condition of said hole and pool of water, and that children resorted thereto as a place of amusement, which fact this plaintiff is informed and believes, and so alleges, has been time and again called to the attention of said defendants, with request that said hole and pool of water be drained and filled in; but that said defendants not regarding their duty in this respect, have carelessly, negligently, wilfully, and wantonly failed and refused to enclose and protect said hole and pool of water in any way and have carelessly, negligently, willfully and wantonly allowed said hole and pool of water to stand open and unprotected.

"(8) That on or about the 28th day of July, 1919, Henry Renno, plaintiff's intestate, a small boy, 9 years of age, while playing or swimming in said hole and pool of water was drowned."

The defendant, Seaboard Air Line Railway, demurred to the complaint, on the ground that the cause of action was solely against the defendant, Walker D. Hines, as Director General of Railroads. The demurrer was sustained, and he answered the complaint, denying the material allegations thereof, and setting up the defense of contributory negligence and wantonness on the part of Henry Renno, who was drowned. At the close of all the testimony the defendants' attorneys made a motion for a directed verdict, which was refused, except in so far as the right of the plaintiff to recover punitive damages was concerned. The jury rendered a verdict in favor of the plaintiff for $2,500. The defendant appealed upon exceptions which will be reported.

The defendants' attorneys in their argument make this statement:

"We will not argue the exceptions *seriatim*. The first nine exceptions assign error in refusing to direct a verdict for the defendants. The tenth exception makes the point that the Court is without jurisdiction of this kind of an

action, it not being based on any common liability of the Director General of Railroads. The exception charging error in the charge of the presiding Judge raises the same question as the first nine exceptions, and, in addition, that said charge was on the facts. We will argue the exceptions under the general propositions."

Practically the first question in the case is whether there was testimony from which a reasonable inference could be drawn that the pond was such a nuisance as rendered the defendant liable in damages. Under the able charge of the Circuit Judge, the jury found that there was such testimony; the Circuit Judge, who saw the witnesses, so found, not only when he refused to direct a verdict in favor of the defendant, but likewise when he overruled the motion for a new trial.

We deem this an opportune time to call attention to the fact that the jury of 12 men, in a common-law case, for which the Constitution provides, has been regarded from time immemorial as better qualified to pass upon the facts of the case then even the Judge. And the presiding Judge, by reason of the fact that he heard the witnesses testify, and could judge of their credibility, had a better opportunity than the members of this Court to determine the proper inferences to be drawn from the testimony. Furthermore, as the jury and the Circuit Judge have found that there was such testimony, there is a presumption in this Court that the trial in the Circuit Court was free from error. Therefore the plaintiff occupies a more favorable position than he did in the Circuit Court, when the burden of proof rested upon him.

We shall proceed to reproduce so much of the testimony as is deemed necessary to show, not only that it was susceptible of a reasonable inference in favor of the verdict, but that it was sustained by an indisputable preponderance

of the evidence, as well as showing recklessness on the part of the defendant.

J. C. Brewington, white, testified for the plaintiff:

"I live close to Lydia Mill; about 200 yards from the pond. Moved there last Christmas. The people of Lydia Mill were accustomed to walking on the track. Have seen them walking along the track from Lydia Mill to Clinton every day. Have seen children playing in this hole. I do not know how many times. I have seen them in there since the boy got drowned. I have seen six or seven little fellows in there. Some were small, and some were good size. Have seen the viaduct after a rain. A little while before the boy got drowned I saw the water within two or three feet of the top of the fill. It backed the water a good piece back, and in this condition the water went through the viaduct with great force, and blowed that pond and made it deeper. I took the boy out. The water was up to my chin."

J. C. Wilson, white, testified for the plaintiff:

"I live in the town of Clinton. Have lived there two years. Before that I lived at Lydia Mill for ten years. For about five years I lived about 200 yards from the hole—in the Brewington House. The fill was there then. This hole has been there ever since I knew about the place. After a rain it blows out. I have seen it over a man's head. Then it would fill up to waist deep. It would be over a man's head after the rain. The force of the water through the culvert washed the hole out. The water would be backed up on the other side of the fill. The culvert was not large enough to carry off the water. Then it would dam up. I have seen the water within two feet of the top of the fill. It would be forced through the culvert with great force. I have seen the children in washing in this hole before the boy was drowned. The hole varied in depth at different times. In case of a rain it

would wash out deep. It varied from knee deep to over a man's head. Right up to the culvert it was always waist deep. I have run boys away from there. I considered it dangerous. If they could not swim, they would drown. The section master passes there every day. I could not say positively whether he has seen children there. I have seen them working near the pond while children were playing in it. I have run children away from there. I ran some little orphan boys away from there. The orphanage is about 1 1-2 miles from the pond. I reported this to Mr. Bland, of the orphanage. I tried to get the children to stay away. The hole was on the lower side of the railroad track. It often filled up. Lydia Mill is about one-fourth of a mile away. The fence crosses the lower edge of the hole. It is a three-strand barbed wire fence. You could go through it easily. It is Mr. Leake's fence and pasture. The fence does not protect the pond or keep the children out. I have seen railroad men clean underbrush from around there. The side of the fill is covered with honeysuckles."

Burn Ubanks, white, testified for the plaintiff:

"I have lived at the Clinton Mills for fourteen years. I lived at Lydia Mills about six years ago. I have been in washing with other boys in this pond. Went there with five boys once. It was seven feet deep then. Mr. Wilson and a railroad man ran me away from there. I was at the pond the day the boy got drowned, but after he was drowned, Mr. Wilson was not a railroad man, but a railroad man by the name of Adams ran me away from there. That was about six years ago. I could not tell you how deep the pond was on the 28th of July. I did not measure it. The general appearance of the pond the day Henry was drowned, and its general appearance six years ago, was about the same."

J. C. Sparks, white, testified for the plaintiff:

"I live at Clinton.  I have lived there and at Lydia about eight years.  I was at Lydia three years ago.  Live about one-fourth mile from the pond.  Saw it at different times while there.  We would pass by the pond going to town. The road passes by the pond on each side of the railroad. I have seen children in washing in the pond.  About three times.  Six in at one time, three at another, and four at another.  I did not know them.  They were from Lydia Mill.  I helped to measure the pond a week or two ago. It is 52 feet long, 22 1-2 feet wide, and 5 1-2 feet deep. It is 26 feet from the center of the railroad to the center of the pond.  I stopped there with them about five minutes. I do not know the name of any of the boys.  It was the last year I lived at Lydia.  I saw the boys in there.  I knew it was dangerous.  I went down and tried to get them away.  I do not remember the time I found six there. They were all from Lydia except one, who was from the Old Mill.  The Old Mill is about one mile from there."

J. C. Idler, white, testified for the plaintiff:

"I am chief engineer and master mechanic at Lydia Mill.  I have been in this work for 30 years.  I have been to this pond.  I was there on the 12th of November and made measurements.  From the center of the railroad track to where the culvert enters the pond is about 26 feet.  The pond is 52 feet long, 22 1-2 feet wide, and 5 1-2 feet deep about the center of the pond.  The culvert is three feet in diameter.  Most of the underbrush has been cut away.  The fill was covered with honeysuckle vines.  The fence looked like it crossed the pond at the lower side. I worked for the railroad for three years as a mechanic."

N. C. Hughes, white, testified for the plaintiff:

"I am county highway engineer.  Have been in that business 25 years.  Attended college in North Carolina.

Took up land drainage work, land surveying, then high-way work, in which I have been engaged for five years. I have worked for the United States Government. Have had experience in estimating the size of culverts necessary to drain land. Examined the culvert in this case yesterday, and found it 36 inches in diameter. From the end of the culvert to the wire fence it is 36 feet. The pond extends from the end of the culvert to 10 feet beyond the fence. The water beyond the fence is shallow. I looked for the head of the stream. It is about one mile from the fill. The area drained by the branch above the stream is about five-tenths of a square mile, or 375 acres. I noticed the size of the stream. The culvert does not figure out to be large enough to carry away the water. According to my calculation, it would take an area of 16 square feet, a 4x4 boxed culvert, or a circular culvert over 48 inches in diameter. The area of the present culvert is a little over seven square feet. Over twice the size of the one there would be necessary. The result of using an insufficient size culvert is to increase the force of the water, and necessarily cause considerable erosion. The hole below the fill apparently was caused by the force and pressure of the water as a result of having too small a culvert. The culvert does not carry off the water. A 4x4 opening would create a very little pond. I would try to put it in a larger culvert if one placed in a thickly populated community is insufficient to take off the water, and cause a deep hole. I would try to make them too large instead of too small. Whether there would have been a pond below the culvert if they had put in a 4x4 opening would depend upon the grade of the outflow. There would have been none if the culvert had had a proper grade. I would say the culvert is not large enough, if water backs up within two feet of the top of the fill. Water so held back would rush through with great velocity. An abnormal rain might back up against the fill,

even through a 4x4 opening. I made no special examina-
tion of the character of the soil. A 4x4 culvert would not
make as great a hole as the one there now."

T. C. Godfrey, white, testified for the plaintiff:

"I was 12 years old on the 16th of last January. I went
to the pond the day Henry Renno got drowned. I had
been there once or twice before. Some of the boys went
there on bicycles, and some of us cut through. I lived at
Clinton, about 1 1-2 miles away by the road, but it is nearer
when you cut through. Three or four went on bicycles,
and one or two cut through. We call this the old baptizing
hole. There were six boys there the day Henry got
drowned. He was younger than I am. One of us could
swim. It is no trouble to climb through the fence. It con-
sists of three or four strands of wire. We went there to go
in swimming. That is the only reason. We did not go
down the railroad track, but cut through the pasture. I had
been there before. John went in first. He could swim.
John told Henry not to go into the deep part next to the
railroad. The part below the fence was shallow. You
could walk out to the fence. It was up to my neck at the
fence. I told Henry if he wanted to go in to come down
to the shallow part below the fence. He went in about
middle ways of the fence, and where the pond begins at the
culvert. It looked like a stepdown at that point, judging
from the way John went in. Henry went in first. When
he first stepped in, the water was chest deep. Then he went
down. He came up three times. When he first got in
the water, it was over his head. I then tried to save
him. When we got to the side to go to him, he had come
up the first time. John tried to get him. I then went
up to a negro house and told a negro woman. Ike Simp-
son came down. I took a stick and tried to reach him.
When I got to the side, he came up, and tried to get the
stick. John came out and said he had pulled him. He

got hold of the stick, and then went down three times. Did not come up again. When I saw he was not coming back up, I left. The other boys had gone. John and myself and a negro were left there. I went up to the cotton mill and told about it. The other boys had already told about it."

D. A. Timmons, white, testified for the defendant:

"I have been living in Clinton for five years. Previously I lived at Mountville 6 1-2 years. During that time I was section foreman for the Seaboard Air Line Railroad. My section covers 6 1-2 miles from Clinton, south, extending beyond Lydia Mill, and this hole on the side of the fill is in my section; and I have known the branch for ten years. I look after the track, but I did not put in the fill. I have seen the hole frequently, and have seen it when it was practically filled up. After a freshet it would blow out again. Sometimes it was deep and sometimes it was practically filled up. The fence has been there ever since I have known it. It fences in Mr. Leake's pasture. A lot of people use the pasture for their stock. I have seen children in there. At times the hole is pretty deep. I never have told them it was too deep for them to go there. I never made a statement at my house that my boy was going down there, and I had stopped him because I thought it was dangerous. I said I heard my boy was going down there, and I did not want him to go in the water. I thought it might cause fever. I have heard that he had been down there. Knew that boys did go in there and knew at the time it was deep. I do not know whether I stopped my boy or not. I did not want him to go in. It is a running stream. I think there is danger from catching fever from a running stream at times. I do not think it was dangerous there. Ought not to go in there if they could not swim. It is dangerous for small boys who cannot swim to go in water over their heads. This fill could

just as safely have a viaduct pipe under it 4x4 feet. Travel over the railroad would be just as safe. I have seen boys in swimming. They will go in swimming. I have four boys. The oldest is 25 years old, and the youngest 11 years of age. I told the youngest not to go in washing this year. Mr. Rhames came to my house and asked me if I had notified the Company about this hole. I told him I did not consider it dangerous, and did not consider anything should be done. An ordinary rain would come and fill it up. At times it was deep, and then it would practically fill up. That conversation was some time in the spring after the first of March. It was before I had this conversation that I told my boy not to go down to that hole. It was the summer the boy got drowned. I had seen children in the pond before the boy got drowned—the same summer and the summer before. I had seen them there every summer."

There are certain facts to which we desire to call special attention: (1) That the pond is 52 feet long, 22 1-2 feet wide, 5 1-2 feet deep, about the center thereof; (2) that the pond was situated in a populous locality; that it was sufficiently attractive to entice children from the orphanage at Clinton, the Lydia Mill, the Old Mill and other places; (3) That the defendant not only had notice of such facts as were sufficient to put him upon inquiry, which, if pursued with due diligence, would have led to actual knowledge, but, as a matter of fact, had actual notice through its agent, who refused to report the condition of the pond to the defendant; (4) that the nuisance was maintained exclusively by the defendant, that the only part of the pond which was dangerous was on its right of way; that the small part thereof—about ten feet—which was in Leake's pasture was shallow, free from danger, and the boys did not go in swimming, at that point; (5) that the defendant did not make any effort whatever to prevent boys

from using the pond from swimming purposes; nor was the
fence, through which the boys passed, built for the purpose
of safeguarding the pond, but simply as an inclosure for his
pasture by Mr. Leake.

In the case of *Franks v. Cotton Oil Co.,* 78 S. C., 10; 58
S. E., 960; 12 L. R. A. (N. S.), 468, it was held that the
parents of an infant may recover for his death by drowning
in a reservoir maintained by the Oil Company, unguarded,
for use in its business, in an open field near the public high-
ways, streets, and houses of a city where children of ten-
der years are accustomed to resort for amusement.

The only material differences in that case and the
one under consideration are: (1) That in the
former the reservoir was used by the defendant in
its business, while the defendant herein made no use of the
pond whatever; and (2) that the pond was not dangerous
all the time. The principles governing both cases are, how-
ever, the same.

"One who artificially brings or creates upon his own
premises, any dangerous thing which from its nature has a
tendency to attract the childish instincts of children to play
with it, is bound, as a mere matter of social duty, to take
such reasonable precaution as the circumstances admit of, to
the end that they may be protected from injury while so
playing with it, or coming in its vicinity." *Thompson on
Neg.,* § 1024.

"Liability in the turntable cases is strictly put upon
the ground of implied invitation to children to come upon
the premises in order to play there, the invitation being
supposed to arise from the attractive nature of these dan-
gerous engines. This hypothesis is hatched up to evade the
obstacle which arises from the fact that the plaintiff is a
trespasser. But it is unnecessary, as it is inadequate and
artificial. Liability is to be ascribed to the simple fact
that the defendant, in maintaining a dangerous agent from

which harm may, under peculiar conditions, be expected to come, has the primary risk, and must answer in damages, unless a counter assumption of risk can be imposed on those who go there to play.   1 *Street's Foundations of Legal Liability,* 160, 161.

"One doctrine under this head (Liability for Injuries to Children) is that, if a child trespass upon the premises of the defendant, and is injured in consequence of something that befalls him while so trespassing, he cannot recover damages unless the injury was wantonly inflicted or was due to the recklessly careless conduct of the defendant. This cruel and wicked doctrine, unworthy of a civilized jurisprudence, puts property above humanity, leaves entirely out of view the tender years and infirmity of understanding of the child, indeed his inability to be a trespasser, in sound legal theory, and visits upon him the consequences of his trespass, just as though he were an adult, and exonerates the person or corporation upon whose property he is a trespasser from any duty towards him, which they would not owe under the same circumstances towards an adult."    1 *Thompson on Neg.,* §1026.

The foregoing and other similar authorities are cited with approval in *Franks v. Cotton Oil Co.,* 78 S. C., 10; 58 S. E., 960; 12 L. R. A. (N. S.) 468.

The failure of the defendant to abate the attractive nuisance (which was useless to him), by simply enlarging the culvert to a proper size manifests a reckless disregard of the rights of the children who might resort to the pond for pleasure.   His Honor, however, charged that the plaintiff could not recover punitive damages, and that phase is not before this Court for consideration.

What has been said disposes of appellant's proposition that the facts of the case do not bring it within what is called the "turntable doctrine," or the "attractive nuisance theory."

The appellant's attorneys have failed to satisfy this Court that there was prejudicial error on the part of his Honor, the presiding Judge, in charging on the facts as submitted by the eleventh and twelfth exceptions.

It is only necessary to refer to Section 10, Act Cong. 1918 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp., 1919 § 3115 ¾j) to show that the tenth exception cannot be sustained. That section is discussed in the case of *Castle v. Southern Ry. Co.,* 112 S. C., 407; 99 S. E., 846; 8 A. L. R., 959, and is as follows:

"That carriers while under Federal control, shall be subject to all laws and liabilities, as common carriers, whether arising under State or Federal laws, or at common law, except in so far as may be inconsistent with the provisions of this Act or any other Act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government. Nor shall any such carrier be entitled to have transferred to a Federal Court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control, or of any Act of Congress or official order or proclamation relating thereto, shall, upon motion of either party, be transferred to the Court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control."

Affirmed.

Messrs. Justices Watts and Wilson, Memminger, DeVore, Sease, Mauldin, and Townsend, Circuit Judges, concur.

MR. JUSTICE MARION: I concur in the result of the majority opinion. I do not think the present case can be distinguished in principle from the previous decisions of this Court applying the principle of attractive nuisance. The facts made a case for the jury under appropriate instructions.

FRANK B. GARY, Circuit Judge (concurring): It is important that we keep before us the precise question we are called upon to determine. As I understand it, the question is: Did the Circuit Judge commit reversible error when he refused to direct a verdict in favor of the defendant, and when he permitted the jury to determine whether or not the defendant had maintained on its premises the pond in question; was it an artificial body of water, attractive and dangerous to children who might follow their childish instincts, and, if so, was it reasonably safeguarded against use by immature children?

The question is raised in various forms of expression, and is embraced in the following exceptions:

"(5) Because his Honor erred in not holding, on defendant's motion for a directed verdict in his favor, at the conclusion of the testimony, that the "wash hole" or pool of water in the branch in which plaintiff's intestate was drowned was not located on or near or in close proximity to a street, public highway, park, or other public place, and that it was not in an incorporated town or village, or in close proximity to or near by a thickly populated community, whereas he should have so held.

"(6) Because his Honor erred in refusing defendant's motion for a directed verdict in his favor at the conclusion of all the testimony on the ground that the wash hole or pool of water was located in the country in a sparsely settled community at a considerable distance from the corporate limits of the city of Clinton, and from the community of the Lydia Mill Village, and partly within the limits of a

private pasture of an adjoining landowner, in a natural watercourse, at some considerable distance from any public highway, street, or public place, and not immediately adjacent to or near by any place where children of tender years resorted for the purpose of play or amusement; whereas he should have so held."

To have warranted such a directed verdict it should have appeared that there was no evidence from which a reasonable jury could have concluded that the pond in question was maintained by the defendant on its premises; that it was alluring to immature children; that in following their childish instincts they would frequent it as a wash hole; that it was dangerous; that the defendant knew or should have known these facts; that it did not take reasonable precautions against such use by immature children. If there was any competent evidence upon all of these subordinate questions, the presiding Judge should not have directed a verdict. For the theory of the complaint is that the defendant maintained upon its premises an instrumentality dangerous to children, attractive to their childish instincts, and which was not reasonably safeguarded, and which resulted in injury to the plaintiff.

It can scarcely be questioned at this time that in this State, at least, when one maintains upon his premises a dangerous instrumentality, which tends to attract the youthful instincts of children to use it for their amusement, a new duty is imposed upon the one maintaining such instrumentality, to wit, the duty of exercising ordinary care to prevent injury to them by coming in contact with it. In other words, he is required reasonably to anticipate the injuries that are likely to happen to them. *Franks v. Cotton Oil Co.,* 78 S. C., 10, 58 S. E., 960, 12 L. R. A. (N. S.), 468. *Hayes v. So. Power Co.,* 95 S. C., 230, 78 S. E., 956. *Tucker v. Clinton Cotton Mills,* 95 S. C. 302, 78 S. E. 890. *Tucker v. Clinton Cotton Mills,* 96 S. C., 466; 81 S. E., 182. *McLen-*

*don v. Cotton Mills,* 109 S. C., 238; 95 S. E., 181. *Sexton v. Noll Co.,* 108 S. C., 516; 95 S. E., 129. This is the doctrine of the "turntable" and "attractive nuisance" cases, now too firmly established in the jurisprudence of our State to be questioned or lightly limited in its scope and operation.

It is true that in those cases in which the foregoing doctrine is announced, the Court was aided in determining whether or not the particular instrumentality in question was dangerous, and likely to be visited by the young and thoughtless by the fortuitous circumstances in each case that the particular instrumentality was near a street or park or in a populous vicinity. But this was only a circumstance for the consideration of the Court or jury, along with other circumstances not a *sine qua non* to the creation of an attractive nuisance and negligent dealing with it. As was well said by MR. JUSTICE HYDRICK in *McLendon v. Cotton Mills,* 109 S. C., 242; 95 S. E., 782, in speaking of whether an attractive nuisance might exist in a remote community:

"What is and what is not negligence depends so much upon circumstances that no inflexible rule can be laid down by which all cases may be determined."

The Court could not say as matter of law that an artificially created body of water, if maintained in a town or populous community, is an attractive nuisance, and that one more remotely located would not be such a nuisance. But the character of the instrumentality should be determined in the light of all the circumstances surrounding it, including the circumstance just referred to. So we repeat that, if there was any competent testimony along the lines mentioned, or testimony from which a reasonable jury might have concluded, that the defendant maintained on its premises an instrumentality that was dangerous and attractive to children, and had not taken reasonable precaution to safeguard it, the case should have gone to the jury.

I will not undertake to detail all the evidence bearing on the questions referred to, for the reason that its recital would prolong this opinion to an unreasonable length. Besides much of this evidence has been set out in another opinion. But I will call attention to the fact that the pond was, according to some of the witnesses, a quarter of a mile from Lydia Cotton Mill Village, and about one mile from Thornwell orphanage; that children from both these places frequented the pond, and used it as a wash hole. Some of the witnesses, after describing the pond, testified that it was dangerous. These facts were known to the railroad men, because the evidence shows that they sometimes ran the boys away from this wash hole. Besides the railroad must have known what is so forcefully expressed by Mr. Justice Cothran:

"That nothing in the range of youthful amusement possesses the allurements of the 'wash hole' to the small boy, shedding his scant raiment as he runs to plunge into its cooling waters."

We may add that it is not essential that the wash hole, in order to exert its alluring influence, and do its damage when not reasonably safeguarded, must be in an incorporated town or near a park or street, or public place, and I may add further that, the greater the alluring force and the greater the danger, the greater should be the precaution to safeguard it against the unthinking. This rule emanates from an enlightened humanity that places human life above the dollar.

In my opinion the presiding Judge would have invaded the domain of the jury if he had directed a verdict as requested. I think the judgment of the Circuit Court should be affirmed.

Mr. Justice Cothran (dissenting): The plaintiff's intestate, a boy about 9 years old, was drowned while bathing in a pool of water on the railroad right of way. The

pool was a widened and deepened portion of a stream that ran through a 3-foot culvert, under an embankment supporting the track, some 15 feet high. In times of heavy rains the surface water of the drainage area of the stream above the railroad accumulated to such an extent that the culvert was insufficient to carry it off promptly. It accordingly was ponded at that point, and rose about halfway up the embankment. The "head" of water thus created forced it through the culvert with such pressure and volume that the water that was discharged from the lower end of the culvert washed out the bed of the stream, forming a pool there of considerable size, some 50 feet in length, 22 feet wide at the widest part, and in depth from six inches to five feet. In usual weather conditions the pool disappears, is filled with sand; and only by heavy rains or freshets is the condition described created.

The theory of the complaint is that the pool was located "in or near the thickly populated settlement of the Lydia Cotton Mill Village," at a point where it was easily accessible to children, ignorant of its danger, who were attracted to it by the "drawings strong" of a wash hole, and that it was not protected by a fence or guard to prevent or at least warn children from yielding to the allurement. The cause of action, therefore, is based upon what has come to be known as the doctrine of an "attractive nuisance."

It is important, therefore, to describe the location and environments of the alleged attractive nuisance, bearing in mind the general principle that a man has the right to make such use of his own property as he pleases, provided such use is not incompatible with the reasonable rights of others (*sic utere tuo ut alienum non laedas*), and that the burden of coming within this exception is upon the plaintiff.

The location of the pool: The small stream is located between the town of Clinton and the station of the cotton mill known as Lydia; it is beyond the corporate limits of

3 S. C.—120.

Clinton, which extend a mile and a quarter from the center of the town, and from a quarter to a half mile from the station of Lydia; it heads about a mile above the railroad, on the west side, passes under the fill, and through a pasture of an adjoining owner, on both sides, for about a mile; a wire fence, inclosing the pasture, crosses the stream at right angles, parallel with the track, about 30 feet from the eastern end of the culvert, outside of the right of way, and incloses in the pasture about one-third of the pool; between the stream and the town of Clinton, on the eastern side of the railroad, are cultivated fields, as there are also on the other side of the stream for a considerable distance; on the upper side of the railroad, for several hundred yards, on both sides of the stream, the land was cultivated in corn; outside of the pasture, and about 50 yards from the end of the culvert, is a negro house, occupied by one Simpson; almost directly across the railroad from Simpson's house is another house occupied by a colored woman; a main public highway leads from Clinton to Lydia Mills, on the upper side of the railroad, and crosses the stream some 300 or 400 yards above the fill; on both sides of this road, a continuation of Bell street (in the town of Clinton), there are 8 or 10 negro houses, half a mile from the pool; on the south side of the stream, on the upper side of the railroad, and between the fill and the Lydia Mill Village, is a house occupied by one Brewington, about 200 yards from the pool; one standing on the fill can see 9 dwelling houses, all within a radius of a quarter of a mile of the pool, and all on the upper side of the railroad except Simpson's; the mill building is half a mile from the fill; the nearest operative's house, on the opposite side of the fill from the pool, is about a quarter of a mile away; the boy who was drowned lived with his father at Clinton Cotton Mills, in the town of Clinton, at least a mile from the pool; there was no playground in the immediate locality, no baseball grounds, ten-

nis court, or apparatus for the amusement of children; the sides of the fill were covered with vines, weeds and grass; there is no road, street, path, or public place of any kind on the side of the track where the pool was; in reaching it one must travel along the railroad or through cultivated fields, and enter at the gate near Simpson's house.

The character of the pool: It was not a place maintained purposely by the railroad company, as a reservoir at a mill would be; it was a fortuitous condition, caused by heavy rains, and the insufficiency of the culvert to carry off the ponded water above the fill promptly; under ordinary conditions it would be filled with sand, only to be blown out at the next heavy rain; one of the witnesses for the plaintiff testified that there was a big rain the day before the boy was drowned, and that the stream had blown out then; that this was the first time he had seen it blow out since he had been living there, in 200 yards of the pool, for two years; it was 52 feet long, 22 feet wide at the widest part, and from 6 inches to 5 feet deep; one-third of its length was inside of Leake's pasture, and the remainder on the right of way; that it was dangerous is established by the fatality that overtook the boy, but not more so than thousands of similar places on thousands of farms in this country.

The circumstances of the fatality: On the 28th of July, 1919, young Henry Renno, a bright, attractive and intelligent boy of 9 years, living at least a mile from the pool, in the town of Clinton, with five companions went to the pool to go in bathing; only one of the six could swim; they approached the pool from the pasture, climbing through the three-strand barbed wire fence which crossed the stream at a point above one-third of the length of the pool; from the fence to the lower end of the pool the water was not more than 2½ feet deep; one of his companions told him not to go in, and particularly warned him not to go into

the deep part next to the culvert; another told him if he
went in to go down to the shallow part below the fence;
he could not swim, but, instead of following the advice
of his companions, stepped off the bank into the deepest
water and was drowned.

The attractiveness of the pool: It is but speaking to the
common experience of every man who is blessed with the
memories of his youth to recall that nothing in the range
of youthful amusements possesses the allurements of the
"wash hole" to the small boy, shedding his scant raiment
as he runs to plunge into its cooling waters. (It is a strange
contradiction of his nature that he suffers from "hydro-
phobia" as to every other form of ablution). The allure-
ment is so universal and so irresistible, and appeals so
strongly to those who remember happier days, that it would
be churlish in the extreme to fence in and run the youth-
ful depredators out of every "hole" that chanced to be
deeper than the small boy's well-known standard. It sur-
mounts every obstacle of dog, bull, or fence, and would
require the presence of guards at every place, whether nat-
ural channel or fortuitous creation, on farm or right of
way, deep enough to drown a boy. As is said in the case of
*Sullivan v. Huidekoper*, 27 App. D. C., 154, 5 L. R. A.
(N. S.), 263, 7 Ann. Cas., 196:

"To hold landowners responsible under such circumstan-
ces would be to impose upon them an oppressive burden,
and shift the care of children from parents to strangers.
Every man who has been brought up with the freedom al-
lowed to American boys knows that you might as well try
to dam the Nile with bullrushes as to keep boys away from
ponds, pools, and other bodies of water."

The test of negligence, as has been often declared by this
Court, in the language of CHIEF JUSTICE GIBSON of Penn-
sylvania, is that precaution becomes a duty only where there
is a reasonable ground to apprehend danger. Where thou-

sands of boys all over the country engage in this amusement
without injury, it cannot with reason be urged that there
was in this case ground for apprehension and consequent
precaution.

This case cannot be brought within the doctrine of the
"turntable" and "reservoir" cases decided by this Court and
others, which are unquestioned, for several reasons: (1)
They contemplate the construction and maintenance of
some dangerous instrumentality or condition for the pur-
poses of the proprietor of the premises; not a fortuitous
condition created without design.   (2)   They are places
of unquestionable danger, within the knowledge of the pro-
prietor, where boys were accustomed and known to exercise
their youthful instincts of curiosity and amusement.   (3)
They are places located on or near a public place, park,
street, playground, or other place open to the view of idling
boys, and by the sight of them constitute an allurement.
(4) They are places which with slight attention could have
been made safe against the depredations.

In the *Bridger Case,* 25 S. C., 24, the child was 12 years
old, and was injured while playing on a turntable located
in an open common near the highway where the boys of
Hendersonville were accustomed to play, and the turntable
was not fenced or guarded or locked or secure when not
in use, but was negligently left exposed and accessible to
children who, not knowing the danger, made use of it as
a means of amusement.   This case followed the United
States Supreme Court case of *Sioux City R. R. v. Stout,*
17 Wall., 657; 21 L. Ed., 745.   In the latter case great stress
was laid upon the facility with which the turntable could
have been securely locked.

The case of *Franks v. Cotton Oil Co.,* 78 S. C., 10; 58
S. E., 960, 12 L. R. A. (N. S.), 468, was where the father
of a 7½ year old boy was allowed to recover for his death
caused by drowning in an artificial reservoir constructed of

brick and cement, maintained by the oil mill for the use in its business, in an open field, near the public streets, and many residences of the city of Laurens where children of tender years, to the knowledge of the corporation, were accustomed to resort for play. Two residence streets of the city of Laurens pass close by this reservoir which was not protected by a fence, guard or otherwise. It was kept filled with water. The children of the community—it being practically in the Laurens Cotton Mill Village—resorted there as a place of amusement, which facts were well known to the manager of the oil company.

In the case of *Hayes v. Power Co.,* 95 S. C., 230, 78 S. E., 956, the evidence showed that the power company built a house on the premises of a cotton mill for transforming electric power for the mill; that a window was left open on the day on which the plaintiff, a 9 year old boy, was seriously injured, and that he reached his hand through the window and touched heavily charged electric wires. This dangerous instrumentality was located in a mill village. In and about the transformer house children of tender years, who were ignorant of the hidden or latent danger, were accustomed to play. The windows of the house were open and unprotected. The transformer house was near a school building. It contained three windows. No warning had been given the children not to play around the house. The boy was injured during the noon recess of the school. He climbed up into the window, put his hand through the window and touched the wires.

The case of *Sexton v. Construction Co.,* 108 S. C., 522; 95 S. E., 129, was where a young child was injured by coming in contact with melted asphalt. The melting pot containing the asphalt was on a vacant lot near South Church street, one of the principal residence streets of the city of Spartanburg, at a place where young children were accustomed to play. On the vacant lot was a pile of sand about

which the children played.  Children frequently passed the
pot containing the asphalt, which was about 100 feet dis-
tant from the sand pile.  No recovery was allowed in this
case; the defective faucet or pipe out of which the asphalt
was allowed to flow was held not to be the direct and proxi-
mate cause of the plaintiff's injury.

In the case of *McLendon v. Cotton Mills,* 109 S. C., 240;
95 S. E., 781, it appears that the plaintiff's intestate was a
child nearly 7 years old, who was drowned in an artificial
reservoir located in the mill village near which the child's
parents lived.  This reservoir was surrounded by a fence
4 or 5 feet high, built of farm wire, with meshes about 3
inches in size at the bottom, and increasing in size to the
top.  A wide plank served as a baseboard, and a 2x4 scant-
ling for a top rail.  The fence was on the top of a sloping
embankment 6 or 8 feet high, which constituted the re-
taining wall of the reservoir.  The wire had broken loose
from one of the posts, and made it easy to get over the
fence.  There was a hole in the bottom of the fence at an-
other place large enough for a boy to go through.  The
gate to the fence was usually kept shut and fastened, but was
occasionally found open.  These omissions, conceded to be
negligence, were not the cause of the injury.  The boy
climbed over the fence where it was in good condition.

This expression in the latter case is significant:

"It is not necessary now to decide whether the rule in the
Frank and Tucker cases, which was applied in thickly
settled communities, should or will be extended to artificial
bodies of water created in sparsely settled communities."

The Court held that a nonsuit should have been granted.

In the Tucker case, 95 S. C., 302; 78 S. E., 890, and
96 S. C., 466; 81 S. E., 182; the injured child was about
14 years old, and was drowned in an artificial dam or reser-
voir maintained in an unprotected condition by the Clinton
Cotton Mills, near the public streets, and many of the resi-

dences of the town of Clinton—in fact in the heart of the mill village—where children were accustomed to resort for play, to the knowledge of the cotton mill, and after the danger had been repeatedly called to the attention of the officers.

The Frank case cited above is the leading case on this doctrine in this state, and an examination of the authorities cited by Mr. Chief Justice Gary, who wrote the opinion in that case, shows that in every instance the dangerous instrumentality, agency, or condition was located in or near or adjacent to a public place, street, or part, and that such location and the nature of the agency was such as to charge the owner with knowledge and notice of the perils and dangers to children of tender years.

The elements of liability which were prominent in each of the cases above cited, where a recovery was allowed, are absent in this case. The McLendon case clearly shows that the tendency of this Court is to limit, rather than extend, the application of the doctrine. This is the tendency of many of the Courts of this country. 20 R. C. L., p. 81; *Mayfield Water Co. v. Webb,* 129 Ky., 395; 111 S. W., 712; 18 L. R. A. (N. S.), 179; 130 Am. St. Rep., 469; *Dahl v. Dredging Co.,* 125 Minn., 90; 145 N. W., 796; 52 L. R. A. (N. S.), 1173; *Barnhardt v. C. M. & St. P. Ry.;* 89 Wash., 304; 154 Pac., 441; L. R. A., 1916D, 443; 12 N. C. C. A., 966, and note; *Bottum's Adm'r v. Hawks,* 84 Vt., 370; 79 Atl., 858; 35 L. R. A. (N. S.), 440; Ann. Cas., 1913A, 1025.

In *Stendal v. Boyd,* 67 Minn., 279; 69 N. W., 899; the Court said:

"We do not extend [the doctrine] to an ordinary case of a landowner merely allowing a pool or pond of water to stand on a vacant lot."

See note on 19 L. R. A. (N. S.), 1098; *Dobbins v. M. K. & T. R. R. Co.,* 91 Tex. 63; 41 S. W., 62; 38 L. R. A., 573;

66 Am. St. Rep, 859; *Ryan v. Towar,* 128 Mich., 463; 87 N. W., 644; 55 L. R. A., 310; 92 Am. St. Rep., 481; *Cooper v. Overton,* 102 Tenn., 211; 52 S. W., 183; 45 L. R. A., 591; 73 Am. St. Rep., 864; *Tavis v. Kansas City,* 89 Kan. 547; 132 Pac., 185, which was a case where a boy was drowned in a pool of a creek immediately below a culvert which the city had constructed in a street. The pool was formed on the property of a private owner over which the city had no control, and it did not appear that any officer of the city knew of its existence. It was unfenced and unguarded. The Court held that the case did not come within the attractive nuisance doctrine. In *Somerfield v. Land & Power Co.,* 93 Kan., 762; 145 Pac., 893, a canal carrying a stream of water 7 feet deep through a populous city, along the bank of which the public passes and children gather to play, fish, and swim, in which a young child fell and was drowned, was held not to be within the doctrine of the turntable cases. The Court held that the canal, having the character of a natural stream, could no more be regarded as an attractive nuisance than could a river flowing through the city or a pond or a lake therein. In the case of *Harper v. City of Topeka,* 92 Kan., 11; 139 Pac., 1018; 51 L. R. A. (N. S.), 1032, it was held that a pond in a city park which was substantially the reproduction of a natural pond, although attractive to children, did not come within the rule of the attractive nuisance doctrine.

See, also, *Sullivan v. Huidekoper,* 27 App. D. C., 154; 5 L. R. A. (N. S.), 263; 7 Ann. Cas., 196; *Thompson v. Ill. Central,* 105 Miss., 636; 63 South., 185; 47 L. R. A. (N. S.), 1101.

This whole subject is well discussed in 20 L. R. C., pp. 79 to 98.

The testimony shows that the pool was not an artificially constructed reservoir, but the accidental result of the forces of Nature. Assume that it was created by the faulty con-

struction of the culvert; that could in no sense have been the proximate cause of the catastrophe. It shows that the danger was not of such exceptional character as to have created an obligation on the part of the railroad company to guard it; it shows that the pool was located on the opposite side of a high fill from the mill village, in an isolated place, where it lacked the allurement caused by a conspicuous location, and where the allurement was presented only to those who deliberately sought out the attraction. The boy was not a resident of the immediate locality, but had to travel at least a mile, over cultivated land, and over a fence, to get to the pool. It would have been practically impossible to fence it against the depredations of boys intent on such amusement. It is essentially different in its nature from a reservoir which is of uniform dangerous depth at all points. The testimony shows that the pool varied from 6 inches to 5 feet in depth, and, if the proprietor knew that small boys were accustomed to bathe there, he could naturally have presumed that the smaller boys would do what young Henry's companion told him to do—stay in the shallow water.

The judgment of this Court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court, with instructions to direct a verdict for the defendant.

MR. JUSTICE FRASER and SHIPP, RICE, BOWMAN, PEURIFOY, and McIVER, Circuit Judges, concur.