JAMES A. TAVIS et al., *Appellees,* v. THE CITY OF KANSAS CITY, *Appellant.*

No. 18,138.

SYLLABUS BY THE COURT.

NEGLIGENCE — *"Attractive Nuisance" — On Private Property — City Not Liable.* Two boys of appellees were drowned in a pool of a creek immediately below a culvert which the city had constructed in a street and across the creek and it was claimed that the opening in the culvert for the passage of water was too small, that in times of freshets the water in the creek was held back by the culvert and forced through the opening in such a way as to make a pool in the creek below the culvert, that the place was attractive to boys who frequently went to the pool to wade and swim, and that as it was unfenced and unguarded, the city, under the attractive nuisance doctrine, was responsible for the drowning of the boys and liable for the loss sustained by appellees. The land where the pool was formed was the property of a private owner and over it the city had no control, and it did not appear that any officer of the city knew of the existence of the pool. *Held,* that the case does not come within the attractive nuisance doctrine and that the city is not liable for the loss.

Appeal from Wyandotte court of common pleas. Opinion filed May 10, 1913. Reversed.

*R. J. Higgins,* city attorney, and *W. H. McCamish,* assistant city attorney, for the appellant.

*J. O. Emerson,* and *David J. Smith,* both of Kansas City, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: The two sons of appellees were drowned in a pool four feet deep in Jersey creek, a natural watercourse which runs through the city of

Kansas City and empties into the Missouri river. Where Jersey creek crosses Thirteenth street the city had made a fill, and had also built a culvert, leaving an opening for the passage of water, seventy feet long, fifteen feet high and eight feet wide, and the pool was on the grounds of a private owner near the end of the culvert. In appellees' petition it was alleged that because of the height of the fill and the smallness of the opening in the culvert the flow in the stream was obstructed so that in times of freshets the water was forced through the culvert in such a way as to cause a pool to form below the culvert, the floor of which, it is alleged, was higher than the natural bed of the stream. This pool, it was alleged, was in a populous part of the city and for some time before the accident children had been attracted there and had been habitually wading and swimming in the pool. It is averred that it was a dangerous place, which had been left unfenced and unguarded, and that no notice warning children of the dangers of the pool had been posted or given. It was alleged that because of the negligence of appellant the children of appellees were lured to the pool and that they lost their lives while wading and swimming in it. The verdict of the jury awarded damages to appellees in the sum of $5000 and with the general verdict they returned answers to special questions as follows:

"1. Q. Was Jersey creek a natural watercourse at the time of the death of plaintiffs' children? A. Yes.

"2. Q. How deep was the water where the boys drowned? A. Four or five feet deep.

"3. Q. How long immediately prior to the drowning had the pool or pond continuously existed without change in depth of water at the place the boys went under? A. Do not know.

"4. Q. Is the bed of Jersey creek subject to change, and, if so, at what times does it change as to depths? A. Yes; after heavy rains.

"5. Q. Was the bed of Jersey creek subject to changes in depth at and prior to the time the boys were drowned, at the place of drowning? A. Yes.

"6. Q. Had there been a heavy rain or freshet a short time before the date of the drowning, and, if so, about how many days? A. Yes; about eight or ten days.

"7. Q. Was the bed of Jersey creek at the point in question, and the water therein, subject to change to such extent that at times prior to June 1, 1911, boys of the age of the deceased could pass the entire length of said pond by wading without getting beyond their depth? A. Do not know.

"8. Q. Was said pond on public or private property? A. Private.

"9. Q. Was there anything about the appearance of said pond or pool which could be observed from passing along the public streets of defendant city, at any time prior to June 1, 1910, which indicated in any way the depth of said pool, and, if so, what was it and at what time? A. No.

"10. Q. Did any of the officers of the defendant city, prior to June 1, 1910, have any actual knowledge of the existence of said pool? A. Do not know.

"12. Q. How high did the masonry of the culvert at the east end extend as compared with the surface of the traveled roadway over the culvert at Thirteenth street? A. Do not know.

"13. Q. Were there any trees and brush between the street and the pool in question? A. Yes.

"14. Q. If you answer the last question in the affirmative, state whether or not the trees and brush and the masonry obstructed the view of this pool from Thirteenth street? A. Yes.

"15. Q. Was the culvert in question of sufficient size to carry off all water which might reasonably be expected to fall in the basin drained thereby? A. No.

"16. Q. If your answer to the last question is in the negative, then state at what time or times, prior to June 1, 1910, there was a failure in this respect. A. Eight or ten days prior.

"17. Q. Was it practicable to fence said pool so as to prevent egress thereto through the bed of the stream? A. No."

It is not easy to understand the grounds upon which the city was held liable for damages in this case. The city did not own or control the ground where the pool

existed and it had no right to build fences or barriers around it. As the findings show there were trees and brush between the street and the pool and people passing along the street could not observe the depth of the water in that part of the creek, and it does not appear that any officer of the city actually knew of the existence of the pool. If the faulty construction of the culvert by the city injuriously affected lands of owners either above or below the culvert such owners might have a right of action against the city, but the owner of the lot upon which the pool is situated is not complaining, and neither do the appellees make complaint against the proprietor, the only one who had a right to fence in the pool or build barriers around it.

The appellees ask to have the attractive nuisance doctrine extended far enough to hold a party who does not own or control the land where the nuisance exists liable. The doctrine has no application to the city even if the form of the culvert indirectly operated to deepen the water in the stream below it. The rule of the attractive nuisance cases has been recognized and frequently applied in this state (*Osborn v. Railway Co.*, 86 Kan. 440, 121 Pac. 364, and cases cited), but it is based on the negligence of the proprietor who fails to protect young children attracted to his premises by some dangerous thing or place artificially created there and where he should have anticipated that the children would be lured into the danger. It assumes that he has the control of the premises and the right and power to erect fences or guards thereon for the protection of children that will be attracted there. In this instance the city had neither ownership nor control of the dangerous place. If it had known of the danger it had no right to enter on the premises and build a fence around the pool, and whatever might have been the duty of the owner of the premises towards the children it is clear that the so-called "turntable" doctrine can

not be extended to include a party so remotely connected with the accident and loss as is the appellant.

The case of *Kansas City v. Siese*, 71 Kan. 283, 80 Pac. 626, is referred to as a precedent sustaining the liability of the city in this case. While a recovery was had there for the loss of a child drowned while swimming in a pond, the facts upon which liability was based are wholly different from those of the present case. There the pond was not a part of a natural stream but had been caused by placing a fill in the street across a deep ravine. An alley of the city crossed this pond. A sewer was placed in the alley by the city and the sewer pipe was built across the pond and rested in a trough supported by piling which had been sunk in the alley. This viaduct, so situated, was attractive and alluring to the boys, and for a long time prior to the drowning they had resorted to the place and habitually climbed along this construction and jumped from there to the water below. This artificial structure built over the pond was the most attractive feature of the place. The city was bound to know not only that it was alluring to young children but also that they habitually resorted to the place to swim. It was a place over which the city itself had control and it was practicable to build a guard or barrier which would have prevented the children from climbing out on the sewer bridge. These features distinguish that case from the one before us.

Another case cited as an authority is *Price v. Water Co.*, 58 Kan. 551, 50 Pac. 450, 62 Am. St. Rep. 625. There a reservoir in which a boy was drowned was constructed and maintained by the proprietor. It was an attractive place for children who habitually went there for play. The proprietor knew of this habit and of the practice of boys to climb over a stile through an unprotected place in the fence around the reservoir. The custodian in charge of the reservoir, knowing of the

danger, permitted the boys to pass through the fence and out upon an apron which rose and fell as the water in the reservoir was increased or lessened. Knowing the danger of the place and that children were attracted to the place the proprietor was held to be negligent in failing to use reasonable care to protect them against the danger.

In this case, aside from the consideration that the city was not the proprietor of the ground where the pool existed and also that it had no knowledge of the existence of the pool, and, further, that it had no control over the ground nor right to enter upon it to fill up the pool or build a barrier around it, the doctrine of attractive nuisances can not well be applied to deep places in a creek or river, and it may well be doubted if there would have been a liability against the city if it had been the owner of the lot where the pool was. All know that there are many pools in every running stream, and when the bed of the stream is not rock deep places are found below every bridge and culvert through which much water passes. It is not practicable to provide openings in bridges or culverts large enough to carry away the water as rapidly as it falls in times of freshets, and the force with which the dammed water goes through the openings under such circumstances is likely to erode the soil or bed of the stream below the bridge. The same effect is noticeable at every bend in the stream, and also wherever there is a tree or other obstruction along the stream which affects the flow of the water. The doctrine invoked is applicable to things or places artificially created by the owner but it can hardly apply to pools or deep places in a river or creek which exist in the order of nature. It would be a long stretch of the doctrine of attractive nuisances if the owners of land through which natural watercourses run were required to protect them by fences or guards as against venturesome children or trespassers who might go there to swim. In *Peters*

*v. Bowman,* 115 Cal. 345, 47 Pac. 113, 598, 56 Am. St. Rep. 106, it was said:

"The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions. As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care. But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different." (p. 356.)

This rule was approved in *Brown v. Salt Lake City,* 33 Utah, 222, 93 Pac. 570, and many cases to the same effect are cited in a note on "Attractive nuisance" in 19 L. R. A., n. s., 1094. (See, also, *Wilson v. Railway Co.,* 66 Kan. 183, 71 Pac. 282, and *Falkenberg v. Stout,* 75 Kan. 172, 88 Pac. 874.)

Under the conceded facts and the findings of the jury no recovery against the city can be had, and, hence, the judgment of the trial court must be reversed and the cause remanded with directions to enter judgment in favor of the appellant.