CHARLES G. BROSE, Administrator, Appellant, v. CITY OF DUBUQUE, Appellee.

**NEGLIGENCE:** Attractive Nuisance—Nonproximate Cause. Negligence may not be predicated on the unguarded maintenance of an alleged "attractive nuisance," when it affirmatively appears that the alleged attractiveness of the thing in question was in no degree the cause of the presence of the injured person at the place of injury.

**NEGLIGENCE:** Proximate Cause—Unguarded Danger. Negligence may not be predicated on the absence of guards or barriers, when it affirmatively appears that their presence would in no degree have prevented the injury in question.

**NEGLIGENCE:** Acts Constituting—Failure to Guard Against the Extraordinary. Negligence may not be predicated on the failure to guard against a rare, extraordinary, and not-to-be-apprehended occurrence. So held where the soil beneath the sod covering of a municipal cement sewer on private property was undermined by a deluge of water, and where the sod gave way and precipitated a pedestrian into the water.

*Appeal from Dubuque District Court.*—D. E. MAGUIRE, Judge.

MAY 2, 1922.

ACTION to recover damages for the death of plaintiff's intestate, caused, as is alleged, by defendant's negligence. Trial to a jury. At the close of plaintiff's evidence, defendant's motion for a directed verdict was sustained. Plaintiff appeals.—*Affirmed.*

*Frantzen, Bonson & Gilloon,* for appellant.

*M. H. Czizek,* for appellee.

PRESTON, J.—Deceased was about seven years of age, and lived with her parents, Charles G. Brose and wife, in the city of Dubuque, some six blocks from the scene of the accident. On July 9, 1919, she was visiting at the home of her aunt, Bertha Kennecker, whose home was situated on Lot 28, West's Addition to Dubuque. The Bee Branch sewer passes in the vicinity of and through Lots 27 and 28, West's Addition, and runs in a northwesterly and southeasterly direction, the flow of the water being to the southeast, and empties into the Mississippi River. It is 7 feet high and 14 feet wide inside, constructed of rock and concrete. The concrete portions are 10 feet in diameter. It has a stone arch across the top, and concrete and rock side walls and bottom. The side walls are two feet thick. It is covered with earth from the Kennecker property across the Milleville road, over into the Heim property, about 720 feet. The intake, about 100 feet southeast, is built after the same design as at the end of the stone sewer in the Kennecker property. The sewers are of the same dimensions. It is partly open and partly covered, on Lots 27 and 28. The lots are large, and there is a large lawn between the houses on the two lots. The sewer was covered by about three feet of earth and grass, which formed part of the lawn at the point where the earth caved in and deceased was precipitated into the water. The sewer itself did not cave in. It was the ground over the rock part of the sewer that gave way; and when the ground gave way, deceased went down into the ditch below the sewer. The evidence shows that the dirt or sod had become undermined by washing. The point where the caving occurred was about 12 feet above the point where the ditch is open. The open ditch below extends about 100 feet southeast, when it is again covered under an alley or street; and from there on to the river are places that are covered and places that are open.

The sewer was constructed partly in 1898, and finished in 1915, in a ravine and natural watercourse. Some of the evidence tends to show that, at places, the ditch was not wide enough for the sewer, and some excavation had to be made. Generally speaking, however, the ditch was as large as the sewer, and the ditch was of the same size, area, and dimensions as the original ditch. The original ditch, or watercourse, had been

there for 60 years or more—as long as the witnesses recollect. For many years it was not covered. It went through these properties more or less diagonally, with something of a bend above the intake at the lower end of the open part of the sewer on the lots. The original ditch entered Lot 27 near the center, and proceeded easterly and passed over a part of Lot 28, which lies immediately south of Lot 27. It was an open ditch, and had always been a part of the lots before the sewer was built. Thereafter, the lot was filled up, and after it was filled, it was in better shape than before. The lawn covering the space between the two homes came within two feet of the mouth or exposed part of the sewer on these lots. It had been in that condition for many years. We do not understand that the city had either purchased or condemned the land for the sewer; it simply built it in the watercourse. The sewer was built by the city in accordance with plans and specifications of its engineers. The owners of the property, knowing the general situation, as they had for years, and living on the properties, had not built any fences or barriers across the path or across the upper end near the open part of the ditch on their properties, or at the sides of the open space; nor had the city done so, or put any screens across the intake at the lower part of the open ditch. Defendant had no control over the properties, and it contends that, as it was private property, it had no right to build fences or barriers thereon. This sewer commences about two miles above the limits of the city, and runs through the south and east portions of the city, a distance of from four to five miles. The upper two and one-half miles of the sewer form an open ditch, about one mile of which is within the northwestern limits of the city. Into it is drained all surface water from the hills and valleys throughout the entire district. It was used for draining and for carrying storm water. Its course is winding, with bends and turns all the way. It runs through streets and private property.

There was a path across the lawn, used to go from the rear of one house to the other. It was across the covered part of the sewer, which had been used as and became a part of the lawn. The path was used and traveled by the owners of the two lots. The public had no right to use the path, and did not use it. De-

ceased and her mother and her mother's other children often used this path to go from one house to the other. The path was about 14 feet from the mouth of the sewer. The path was about a foot wide,—pretty well worn. It could plainly be seen. It was made by people, walking back and forth in the yard between the two houses. The ground where the path was, appeared solid, and that was its condition for several years prior to July 9th. There was nothing about the path that appeared to be unsafe and dangerous. The ground where the path was, was even with the balance of the lot,—that is, before the storm, and before it caved in. Outside of the beaten path, the lawn was sodded all over to within about two feet of the mouth of the sewer. As deceased was walking over the covering of ground and sod over the sewer about the center of the arch, the covering gave way, and the force of the water swept her into the sewer. Her body was found the next day, some 10 or 12 blocks below, and in the sewer. A few seconds after the ground gave way under deceased, the ground gave way under Mrs. Kennecker's feet, and she went down. It appears that deceased and the other children had, prior to this date, played in the lawn over the sewer, and when the water was low, they had played in the open ditch, building dams in the ditch with rocks, just to make a little pool there to play; that there was always a little water running; that there was very little water, except in times of rain; that the greater part of the water carried through the sewer was storm water. At the time of the accident, deceased was not playing, but was going from one house to the other. It was, at the time, raining very hard. The water had not overflowed the banks of the ditch, but it was up to the top of the banks. As the water came out of the mouth of the sewer, there was so much coming down that it couldn't flow out of it, and it came out and swirled around. The water in the ditch looked as though it was going around in circles and whirlpools,— "pretty wild looking water," as one witness puts it. Before July 9th, the ditch was about 10 to 12 feet deep and about 20 feet wide. A witness testifies that he had seen it filled to its banks with water, prior to July 9th. People had thrown rubbish into the ditch,—rocks, etc. The intake below the property in question, prior to July 9th, was fairly clean. There was

some water in the yard, but the yard was not covered with the water at the time of the accident. Immediately after, it got higher, and rose a couple of feet. All the ground around there which, prior to July 9th, was a lawn, had been washed away by the storm. The evidence does not show whether deceased was drowned before or after she was swept into the intake of the sewer, a hundred feet below the cave-in.

It is alleged in the petition that, while deceased was visiting at the home of her aunt on the date in question, there was a heavy rain storm; that Lemon Street became flooded; that the dwelling on Lot 28 was being flooded, and the dwelling on the adjoining lot, Lot 27, appeared to be safer; that deceased started to follow her aunt over and across the above described property to the dwelling on Lot 27; that, while she was walking over the covering over said Bee Branch sewer, which passes through said lots, the same gave way, and the force of the water swept deceased into said sewer, causing her to lose her life; that deceased was not negligent. It appears from the evidence that the mother or aunt, carrying another child, had safely crossed the point that later went down with deceased. The water had washed out the ground, not merely over the top at the point in question, but the sides of the ditch were washed away, leaving it some 32 feet wide in places, where it had originally been 10 feet wide.

The negligence charged is that defendant constructed and maintained said Bee Branch sewer in such a way as to leave openings therein, without any protection or barrier of any kind, and without any grate, screen, or covering, to prevent people from falling into the same and being washed into the same; and that the city failed to provide the sewer with sufficient capacity to carry off the excess water accumulating in and about Lemon Street, and failed to provide a storm sewer of sufficient capacity to carry off the water coming over and across Lemon Street and adjacent territory.

It was also alleged that, within 30 days after the death of deceased, to wit, on August 7, 1919, a notice and verified statement of the time, place, cause, and extent of the injury causing the death was served upon the defendant, as required by law and the ordinances of the city. The notice recites that, at the time deceased was swept into the sewer, the amount of water in the

sewer was great, because of a heavy downpour of rain. The statements therein and the grounds of negligence are substantially the same as alleged in the petition, except that the notice recites that the accident occurred between the hours of 3 and 4 o'clock in the afternoon of said date.

Defendant, answering, denies generally, but admits that the sewer in question ran in the direction stated, and that the water flows to the southeast; admits that, on the day in question, there was a heavy rainstorm, and that Lemon Street in the city became flooded. Further answering, it states that, on the date named, there occurred within the city of Dubuque and within the immediate vicinity an extraordinary, unprecedented rain; that the valleys to the north and the district drained by this sewer and ditch were flooded, so that the water was not confined within any definite bounds; that the place where the accident happened was in the path of the flood, and was being flooded; that the death was caused by said unprecedented rainstorm; that the rainfall could not reasonably be anticipated by defendant; and that the death was due to the act of God, and not to any negligence of the defendant. The answer further alleges contributory negligence.

The trial commenced May 10, 1920. On May 11th, plaintiff amended, setting up the 30-day notice, and on May 12th, plaintiff asked leave to file another amendment, alleging that the capacity of the sewer in question was not sufficient to carry the water accumulating above the sewer when there were heavy rains; that, on July 9th and prior thereto, in the intake or sewer to the southeast of the opening on Lots 27 and 28, the flow of water was obstructed and retarded; that said sewer was partly closed because of an accumulation of rock, mud, brush, and other debris which lodged therein to the depth of about a foot, which condition the city knew, or in the exercise of due care and caution should have known, but negligently allowed to remain; that, by reason of said accumulation, the water passing through the same on July 9th was held back in the open portion of the sewer on said lots, causing same to rise to the top of the banks and undermine the covering over that part of the sewer upon which deceased was walking, thereby weakening its sup-

port; that, as she stepped upon it, the ground gave way, causing her to fall; that the city was negligent in not keeping the sewer free and clear from mud, rock, brush, etc, and in not maintaining said sewer in a proper manner, so as to take care of the water flowing into it from the territory to the northwest; that deceased lost her life by reason of the negligence of said city in maintaining its sewer, etc. As we understand the claim in regard to the obstruction just referred to, it has reference to an obstruction some 200 or 300 feet below, at about the Schiller property. A witness for plaintiff testifies that, in his opinion, the backing-up and swirling of the water at the upper end of the open part of the lots in question washed out the soil underneath the sod as far up the stream as the point where it caved in with deceased. The plaintiff sought to go into this matter more fully, but the court indicated that, in his view of it, it was not proper to go into all the conditions at other points. Defendant objected to the filing of this amendment, on the ground that it set up a new cause of action, and that the negligence charged against defendant by this amendment was other and different from the negligence stated in the petition and in the 30-day notice. The objection was sustained, and the court refused to permit plaintiff to file said amendment. At the close of plaintiff's evidence, he renewed his request to file the amendment, which request was again denied. At the close of all the evidence, defendant filed its motion for a directed verdict, on the following grounds: No negligence is shown on the part of defendant. The undisputed evidence shows, that, at the place in question, the ditch or sewer was a watercourse upon private property, and of such a character that defendant was not charged with any legal duty or responsibility to maintain or construct the same. Plaintiff was guilty of contributory negligence. There is a variance between the testimony and the notice of claim filed with the city as to the time of day when the accident happened. And finally, the evidence shows that the death was caused by an unprecedented flood,—the act of God,—for which defendant was not responsible. The motion was sustained generally. Defendant is a special charter city.

1. Appellant contends that the court erred in refusing

the amendment. We shall take no time in the discussion of that question, since, in the view we take of the case, plaintiff has not shown, in any event, a right of recovery.

2.   Some of the cases cited by appellant relate to the duty of the city to maintain its streets in a reasonably safe condition for travelers. The place in question was not dangerous to the traveling public, and there was no duty devolving upon the city to erect a barrier to protect travelers upon the street from such injury. The case involves the liability of the city to another class of persons than travelers upon its streets. *Tally v. City of Atlantic*, 92 Iowa 135. In that case, children at play in a sand pit undermined the sand, and were killed.

Plaintiff seems to rely most strongly upon the proposition that the city is liable because the sewer or ditch was an attractive nuisance. The argument is that, where an attractive nuisance is maintained at or near a place where children gather for the purpose of play or amusement, the party maintaining such attractive nuisance is answerable in damages sustained, for the reason that children, with their childish curiosity and instinct, would come in contact with the dangerous places or instrumentality, and the law imposes upon him the duty of guarding against such danger and furnishing protection against such injuries; that the duty arises because the party in control has reason to anticipate that someone will sustain injury if there is an omission to guard the attractive nuisance; and further, that, although the dangerous thing may not be what is termed an attractive nuisance,—that is, may not have especial attraction for children,—yet, where it is so left exposed that they are liable to come in contact with it, and where their coming in contact with it is obviously dangerous to them, a person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them from its being so exposed, and is bound to take reasonable pains to guard it. It is true that deceased and other children had, at other times, played in and around this sewer on these lots. But under the evidence, there could be no claim that, at the time in question, deceased was attracted thereby. A severe storm was in progress, and

1. NEGLIGENCE: attractive nuisance: non-proximate cause.

she simply followed her aunt to another place. For this reason alone, it seems to us that the doctrine does not apply here. Appellant cites no Iowa cases on this point except *McGee v. Jones County,* 161 Iowa 296, 300; *Harvey v. City of Clarinda,* 111 Iowa 528; and *Downing v. Merchants Nat. Bank,* 192 Iowa 1250. We think these cases do not involve the question of attractive nuisance. In the *McGee* case, the issue was as to whether defendant was liable for failure to provide barriers or guard rails for a bridge and approach, when a horse walked off the approach. In the *Harvey* case, the injury occurred in the street, and the question was whether the city was liable for failing to erect railings or barricades to an approach or embankment at a railway crossing. The *Downing* case was an action for personal injuries sustained by plaintiff in falling down a stairway in the defendant's bank building. No Iowa cases are cited by appellee on this point. They cite *Tavis v. City of Kansas City,* 89 Kan. 547 (132 Pac. 185); *City of Rome v. Cheney,* 114 Ga. 194 (55 L. R. A. 221); *Clark v. City of Richmond,* 83 Va. 355 (5 S. E. 369); *Capp v. City of St. Louis,* 251 Mo. 345 (Ann. Cas. 1915 C, 245); *City of Indianapolis v. Emmelman,* 108 Ind. 530. Without discussing the question at length, we think the case does not come within the rule of our cases in regard to attractive nuisance. Some of the later cases on the subject of attractive nuisance are *Edgington v. Burlington, C. R. & N. R. Co.,* 116 Iowa 410; *Fishburn v. Burlington & N. W. R. Co.,* 127 Iowa 483; and other cases cited in *Wilmes v. Chicago G. W. R. Co.,* 175 Iowa 101, 105. The first two cases were turntable cases, and the *Wilmes* case was where a railroad wreck had occurred on defendant's railway. Plaintiff was injured by a curved rail, which struck him. He was a boy 11 years of age. He went to the place to view the wreck, and out of curiosity. There was no invitation, implied or otherwise, to the plaintiff, to be where he was. The court held that he could not recover. See, also, *Smith v. Illinois Cent. R. Co.,* 177 Iowa 243, 248, where the things requisite to constitute an attractive nuisance are stated. That was a case where a child was burned in a dump ground on defendant's property. *Held* not an attractive nuisance. See the same case in L. R. A. 1917 F, 1033. Other cases on the ques-

tion are *Davis v. Malvern Light & Power Co.*, 186 Iowa 884, where a directed verdict for defendant was affirmed, and *Blakesley v. Standard Oil Co.*, 193 Iowa 315. In that case, a rehearing was granted upon other grounds, and a later opinion was recently rendered, in which this question is not considered, because not in the case. The first opinion is referred to, only as having some bearing upon the question now under consideration. See, also, as having a bearing, cases cited in the Iowa Law Bulletin, Volume 7, No. 2.

Other questions present themselves, which we shall refer to without any extended discussion. If it be conceded, for the sake of argument, that there was a duty owed by defendant to deceased to fence or barricade the sewer, where and how should it have been guarded, and would the guard have been effective? We suppose appellant would not contend that defendant had a right to build a fence across the path on the private property, so as to have prevented deceased from crossing the sewer at that point. Suppose there had been a fence or barrier in the lawn where the closed sewer, at the upper end, emptied into the open sewer, and the covering had caved in as it did, and deceased had fallen in. She would have been washed down the stream under such a barrier. Or suppose the open ditch had been guarded and fenced on both sides. Or suppose there had been a screen or grate across the intake at the lower end of the open ditch. It would have prevented the body from being carried into the sewer, but would it have prevented the drowning? Deceased was in this wild, swirling water before she reached the intake, for a distance of about 120 feet from the point where she fell in. It may be that the body was carried around in the swirling water, or in traveling that distance, she may have drowned before reaching the intake. In that case, whether the intake was screened or not would be immaterial. As before stated, the evidence does not show whether she was drowned before reaching the intake, or after her body passed into the sewer.

3. It may be conceded, as contended by appellant, that deceased was not a trespasser, in passing along the path, since she

*2. NEGLIGENCE: proximate cause: unguarded danger.*

was with her relatives, who were visiting the owners of the property. As to the owners, she would doubtless be at least a licensee, and surely not more than that as to the defendant. The duty of a party maintaining dangerous premises towards a licensee is stated in the *Davis* case, supra, at page 888, and in the *Wilmes* case, supra; also, in *Connell v. Keokuk Elec. R. Co.,* 131 Iowa 622.

4. After all, should it be held, under all the circumstances of this case, that the premises were dangerous; that defendant owed deceased the duty as claimed by appellant; that the city should have anticipated that this unfortunate circumstance would occur as it did, and that the heavy storm would come as it did, and that the water would undermine the sod over the sewer, and that deceased and her relatives would cross the lawn for safety, and that, at the very time deceased was over the sewer, it would cave in under her; or that, because of the failure of defendant to fence or barricade, or even its permitting the sewer to become obstructed by rocks, brush, etc., at Schiller's, some distance below, or even the failure of the city to obstruct by grates the intake at the lower end of these lots, deceased thereby lost her life? Or rather, was there a question for the jury in regard to these matters? We think not. On the contrary, we are of opinion that, under this entire record, the accident was one of a class so rare, unexpected, and unforeseen that defendant cannot be charged with negligence of which plaintiff can complain, for failure to guard against it. *Talty v. City of Atlantic,* supra. See, also, *Biegel v. City of New Orleans,* 143 La. 1078 (79 So. 867), a case in which a child four years old fell from a sidewalk into a ditch near the end of a culvert, was drawn into the culvert by swiftly flowing water, and drowned. It was claimed that the city was negligent in not having placed a grating or protection of some kind at the end of the culvert, to prevent the drowning of a child who might fall into the ditch. The court said:

"We cannot reconcile our minds to the opinion that the municipal authorities are to be blamed or found guilty of actionable negligence for their failure to foresee and guard against

*3. NEGLIGENCE: acts constituting: failure to guard against the extraordinary.*

such an extraordinary occurrence as this was. We are not assured—in fact, we have much doubt—that a grating at the end of the culvert, such as is suggested in plaintiff's petition, would have saved the child's life. If such a safeguard had been there, and the child had been killed by being hurled against it, we might now be wondering whether the child could have passed through the unobstructed culvert·unhurt. It is not contended that the municipal government was at fault in failing to have railings along the edge ·of the sidewalks, to prevent children from falling into the gutters or ditches. On the contrary, it must be conceded that the municipality could no more avoid the possibility of a child's falling into an open ditch or gutter than it could make it impossible for a child to fall into the river. The plaintiff's contention, therefore, resolves itself into this: That the city should ·have had life-saving contrivances for children who might fall into an open ditch. * * * Our conclusion is that the city is not responsible for this deplorable accident.''

In that case, it was admitted that the system of drainage was inadequate at the time of the accident, and a rain had filled the ditches. The water was rushing, through the culvert, and the child, in falling into the open ditch, was drawn into the culvert, as stated. In *City of Rome v. Cheney,* supra, a nine-year-old child was drawn into an open culvert which led into an open sewer, and was drowned. It had just rained hard, and the water near the culvert was flowing swiftly into it. The child, walking along the sidewalk, or wading in the water near the open culvert, slipped and fell into the open culvert, and was drowned. The negligence charged was that the city had constructed a large sewer near the sidewalk, and allowed it to remain in a dangerous condition, with no grating to prevent objects or bodies from being washed into the underground sewer. It was shown, however, in that case, that any impediment to the flow of water in the nature of grating over the hole connecting the two sewers would have clogged the grating with trash and mud, and caused the gutter to overflow, in times of heavy rain, and do serious damage. It was held that there could be no recovery, because the city could not be charged

with the duty of guarding against so unusual and unlikely an occurrence as the washing of the body of the child through the trap or hole. See, also, *Carey v. Kansas City*, 187 Mo. 715 (70 L. R. A. 65), where the city had built a fence four and one-half feet high around the water supply reservoir in a public park, so constructed that children must remove their shoes to climb it, and it was held that this was sufficient to relieve the city of liability because of a death. This case is cited in *Kelly v. Benas*, 20 L. R. A. (N. S.) 903, 906, and note in 19 L. R. A. (N. S.) 1147, on attractive nuisance. We cite, as sustaining our holding, other cases, without quoting or discussing them, holding that the city should not be required to anticipate such an unusual occurrence. *Briglia v. City of St. Paul*, 134 Minn. 97 (158 N. W. 794); *Goeltz v. Town of Ashland*, 75 Wis. 642 (44 N. W. 770); *Nutting v. City of St. Paul*, 73 Minn. 371 (76 N. W. 61); *Fuchs v. City of St. Louis*, 167 Mo. 620 (57 L. R. A. 136). There are cases, of course, where the circumstances are such that the city may be required to anticipate the action of the elements. See the recent case of *Kiple v. Incorporated Town of Clermont*, 193 Iowa 243, and the same case, 188 Iowa 248. In that case, the defect was in the street.

5. One or two other questions argued will be mentioned very briefly, since the views already expressed are controlling. The evidence introduced on behalf of plaintiff tends quite strongly to show that the storm and flood were unprecedented, although there is evidence that, prior to this, the open ditch had been bank-full more than once. The defendant introduced no evidence on that branch of the case, and under the circumstances, we express no opinion as to whether there was a jury question as to that. We think the evidence does not show that deceased was guilty of contributory negligence, at least; but for the other matters, that would be a question for the jury. We think there is no merit in appellee's claim that there was a fatal variance between the evidence and the allegations of petition and the statements in the notice to the city as to the time of day when the accident occurred. The allegations are that it was between 3 and 4 o'clock in the afternoon; whereas the

evidence shows that it may have been an hour or two earlier than that.

For the reasons given, the judgment of the district court is—*Affirmed.*

STEVENS, C. J., WEAVER and DE GRAFF, JJ., concur.